IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **RENEE PLUNKETT**, an individual, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   2:16cv1512 |
| | )   **Electronic Filing** |
| **MATTHEWS INTERNATIONAL** | ) |
| **CORPORATION**, | ) |
| | ) |
| Defendant. | ) |

## OPINION

Renee Plunkett ("plaintiff") commenced this employment action against Matthews International Corporation ("defendant" or "Matthews") asserting violations of her rights under the Family and Medical Leave Act of 1993 ("FMLA") and claims for wrongful discharge and breach of contract under Pennsylvania law.  On September 30, 2019, an order was entered resolving defendant's motion for summary judgment.  The motion was granted as to plaintiff's state law claims for wrongful discharge and breach of contract and denied in all other respects. This opinion is issued in support of that order.

Federal Rule of Civil Procedure 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(A).  Rule 56 "'mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'"  Marten v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322– 23 (1986)).  Deciding a summary judgment motion requires the court to view the facts, draw all

reasonable inferences and resolve all doubts in favor of the nonmoving party.  Doe v. Cnty. of Centre, Pa., 242 F.3d 437, 446 (3d Cir. 2001).

The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact.  When the movant does not bear the burden of proof on the claim, the movant's initial burden may be met by demonstrating the lack of record evidence to support the opponent's claim.  Nat'l State Bank v. Fed. Reserve Bank of New York, 979 F.2d 1579, 1581-82 (3d Cir. 1992).  Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a *genuine issue for trial*," or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Electric Industrial Corp. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(E)) (emphasis in Matsushita).  An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In meeting its burden of proof, the "opponent must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita, 475 U.S. at 586.  The non-moving party "must present affirmative evidence in order to defeat a properly supported motion" . . . "and cannot simply reassert factually unsupported allegations."  Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989).  Nor can the opponent "merely rely upon conclusory allegations in [its] pleadings or in memoranda and briefs."  Harter v. GAF Corp., 967 F.2d 846, 852 (3d Cir. 1992); Sec. & Exch. Comm'n v. Bonastia, 614 F.2d 908, 914 (3d Cir. 1980) ("[L]egal conclusions, unsupported by documentation of specific facts, are insufficient to create issues of material fact that would preclude summary judgment.").  Likewise, mere conjecture or speculation by the party resisting summary judgment will not provide a basis upon which to deny the motion.  Robertson v. Allied Signal, Inc., 914 F.2d 360,

382-83 n.12 (3d Cir. 1990).  If the non-moving party's evidence is merely colorable or lacks sufficient probative force summary judgment may be granted.  Anderson, 477 U.S. at 249-50; see also Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992), cert. denied, 507 U.S. 912 (1993) (although the court is not permitted to weigh facts or competing inferences, it is no longer required to "turn a blind eye" to the weight of the evidence).

The factual background set forth below is derived from (1) the undisputed record evidence and (2) the disputed record evidence viewed in the light most favorable to plaintiff, the non-moving party.

Plaintiff began working for defendant on 04/23/2012 as a letter picker/puller and straightener in the set-up department of defendant's bronze division located on West Liberty Avenue in Pittsburgh, Pennsylvania.[1]  Less than two weeks later, on 05/06/2012, plaintiff's supervisor gave her a write-up (i.e., written warning) for excessive errors and low output.[2]

Defendant consistently has had a long-standing practice of conducting annual reviews of its employees' performance during the previous 12-month period.[3]  These annual

---

[1]  Throughout her employment with defendant, plaintiff did not have a formal written contract of employment nor was she a member of a union.  (50-1 at 42).  She was, in other words, an at-will non-union employee.  In that capacity, she worked the 5:00 a.m. to 1:30 p.m. shift as a non-exempt hourly production employee.

[2]  An employee "write-up" is a formal disciplinary action that is documented on a green sheet of paper that gets sent "to corporate."

[3]  The rating scale in defendant's performance reviews is comprised of three categories of total scores: (1) a total score of 16 or greater "Exceeds [the] Standard"; (2) a total score of 12 to 15 "Meets [the] Standard"; and (3) a total score below 12 "Does Not Meet" the standard set by defendant.  Thus, the minimum total score needed to meet the standard is 12, and any score below that is deemed to be substandard.

The total score is itself comprised of seven subcategories, each of which has a corresponding score range: (1) Multi Skill, which ranges from 1 (if the employee can only perform and meet production standards for one job) to 3 (if the employee can perform and meet production

performance reviews generally are done in or around July of each year.  In addition to annual performance reviews, which are seemingly conducted on all or nearly all of defendant's employees, midyear performance reviews typically are conducted on specific employees who receive a substandard score on their annual performance review.[4]  Such "underperforming" employees are thereafter placed on a performance improvement plan ("PIP").

On 07/30/2012, a little over three months after plaintiff started working for defendant, she was given her first annual performance review by her then-supervisor David ("Dave") George.  In that review, plaintiff received a total score of 11, which was one point below standard.[5]  The evaluator's objectives/goals for plaintiff's next review included to "[r]educe distraction[s]…that slow you down and your coworkers [which] will help in reducing errors from yourself and others and improve the productivity by all."

---

standards for more than 3 jobs); (2) Attendance, which ranges from 0 (if the employee has received an attendance-related written warning or suspension) to 3 (if the employee has fewer than 3 attendance-related occurrences); (3) Disciplinary, which ranges from 0 (if the employee has received a written warning or has received a suspension) to 2 (if the employee has not received any warnings); (4) Productivity, which ranges from 0 (if the employee has received some form of documentation stating that he or she is not performing satisfactorily) to 3 (if the employee exceeds the productivity standards); (5) Quality, which ranges from 0 (if the employee has received some form of documentation stating that he or she is not performing satisfactorily) to 3 (if the employee exceeds the quality standards); (6) Customer Service & Teamwork, which ranges from 1 (if the employee needs improvement in this area) to 3 (if the employee exceeds the standards in this area); and (7) Safety Wellness, which ranges from 0 (if the employee needs improvement in this area, i.e., if the employee is notified of a safety infraction or policy violation in this area) to 2 (if the employee exceeds the standards of awareness and participation in this area).

[4]  There is evidence suggesting that midyear performance reviews are also conducted on employees who receive extraordinarily high scores on their annual performance reviews.  See, e.g., Doc. 55-3 at 39.

[5]  The breakdown of plaintiff's subcategory scores on her first annual review is as follows: (1) 1 out of 3 points for Multi Skill; (2) 3 out of 3 points for Attendance; (3) 2 out of 2 points for Disciplinary; (4) 1 out of 3 points for Productivity; (5) 1 out of 3 points for Quality; (6) 2 out of 3 points for Customer Service & Teamwork; and (7) 1 out of 2 points for Safety Wellness.

At some point after plaintiff was hired by defendant, she developed a painful blood clotting condition in her legs that caused them to swell, resulting in severe discomfort, particularly while standing to perform her job duties.  These symptoms distracted plaintiff and hindered her work, which she communicated to her supervisors.  (Doc. 55-3 at 19).  On 11/29/2012, 01/22/2013, and 02/22/2013, plaintiff was given employee conference forms for low output/performance, excessive errors, not following procedures, distractions (talking), and leaving the work area for extended periods of time.[6]  On the last of these conference forms, plaintiff commented that she "feels she can correct and improve."

On the night of 06/06/2013, plaintiff sought emergency medical treatment for a leg infection and was hospitalized, after which she began treating with a vascular doctor.  On 06/08/2013, she called her then-supervisor John/Jack Dentel ("Dentel") to notify him of the situation.  She informed him that she would be released from the hospital later that day but that her doctor had advised her to be "off her feet" for a week and not to return to work until 06/17/2013.  Plaintiff was prescribed blood thinners for her clotting condition, which her doctors advised could be irritated by standing.

After her release from the hospital, plaintiff asked defendant's Human Resources ("HR") professional, Faith Stipanovich ("Stipanovich"), for forms needed to request FMLA leave for her leg condition.[7]  Thereafter, plaintiff received a letter from Stipanovich, dated

---

[6]  An employee "conference" is an action taken by defendant for training and coaching ( i.e., ostensibly non-disciplinary) purposes.  While it is not a disciplinary action in itself, it is done for the additional purpose of establishing a documented record that may be taken into account during the employee's performance review.  Unlike a write-up that goes to corporate, the conference form is kept in the employee's personnel file.  The determination of whether to write-up or conference an employee is made at the discretion of the foreman, based on the severity of the act for which the employee is being disciplined.

[7]  To be clear, on this occasion (June 2013) plaintiff requested FMLA leave for her *own* serious health condition.  The record indicates that on a previous occasion (around April 2013), plaintiff

06/10/2013, that provided information regarding her rights under FMLA as well as the forms needed to request FMLA leave.  Plaintiff's request for FMLA leave subsequently was received by the Department of Labor's Wage and Hour Division ("DOL") on or before 06/14/2013.  On 06/17/2013, the DOL approved plaintiff's request for 96 hours of FMLA leave between 06/07/2013 and 06/23/2013.  On 06/27/2013, the DOL approved an extension for an additional 64 hours of FMLA leave between 06/24/2013 and 07/03/2013.  Plaintiff's FMLA leave on this occasion resulted in her being off work on 06/07/2013 and not returning until 07/08/2013.

On 07/24/2013, when plaintiff was working in straightening, she was given her second annual performance review by her then-supervisor, Jack Dentel.  In that review plaintiff received an overall score of 8, which was four points below standard.[8]  The evaluator's comments particularly emphasized the need for plaintiff to increase her productivity/efficiency and quality, and included language nearly identical to the first review's suggestion to "[r]educe distractions…that slow you down & your coworkers [which] will help in reducing errors from yourself and others and improve productivity by everyone."

Following that review, on 09/25/2013, plaintiff was given a verbal warning for attendance after having accrued seven (7) occurrence "points" under defendant's Attendance

---

had requested FMLA leave to care for her *boyfriend's* serious health condition and was denied because he was not a spouse or other qualifying family member under the FMLA.

[8]  The breakdown of plaintiff's subcategory scores for her second annual review was as follows: (1) 1 out of 3 points for Multi Skill; (2) 2 out of 3 points for Attendance; (3) 0 out of 2 points for Disciplinary; (4) 1 out of 3 points for Productivity; (5) 1 out of 3 points for Quality; (6) 2 out of 3 points for Customer Service & Teamwork; and (7) 1 out of 2 points for Safety Wellness.

Thus, in comparison to her previous review, plaintiff's Attendance score went down by one point and her Disciplinary score went down by two points, while her scores in all other categories stayed the same.

Control Policy during the preceding twelve-month period - from 09/25/2012 to 09/25/2013.[9]

During this time plaintiff was assessed half a point for each of two days when she left work

early (i.e., she missed less than two hours of the scheduled work day on 11/02/2012 and

08/12/2013).  Plaintiff also was assessed one point for each of six absences on 10/22/2012,

11/30/2012, 01/07/2013, 03/01/2013, 05/11/2013 and 07/25/2013.  As to this last date of

absence, it occurred in the context of four consecutive work days (07/22/2013 through

7/25/2013) when plaintiff called off sick and subsequently produced a doctor's excuse; it also

was two weeks after she returned from FMLA leave on 07/08/2013.

      Pursuant to defendant's Attendance Control Policy, one occurrence point is assessed

"for an absence from work of two or more consecutive days if medical documentation

establishes that all of the days absent were caused by a condition requiring medical treatment

[and] 3 consecutive days of absence will require a signed doctor's [note] upon [the

employee's] return to work[, which] note must indicate the ability to return to work and

excus[e] each day of the absence.  The occurrence will count as 1 point (unless the absence is

due to FMLA) and will be tracked from the last day of the absence."  As clarified by

Stipanovich's testimony, this means that an employee will be assessed at least one occurrence

point for being absent due to illness, unless the absence qualifies as a recognized exemption

(e.g., "Approved FMLA Leave, Workers Compensation, [or] Short Term Disability").  In

---

[9]  Under defendant's Attendance Control Policy, which applied to all hourly, non-exempt employees, each attendance-related "occurrence" was assessed a certain number of "points" that would be tracked for a rolling twelve-month period.  For example, if an employee missed work on April 2, 2012 and it was a no call/no show absence, the employee would be assessed 2 points for that occurrence and that 2-point occurrence would continue to count against them until April 3, 2013.  Notably, the policy specifically exempted absences for, among other reasons, "Approved FMLA Leave, Workers Compensation, and Short Term Disability (including waiting period)."  Employees who accrued more than six (6) occurrence points during a given rolling twelve-month period were subject to disciplinary action, e.g., an employee who accrued seven (7) points would be given a verbal warning.

plaintiff's situation, she was assessed one point for her absence because she produced a doctor's excuse.  Had she failed to produce a doctor's excuse, she would have been assessed one occurrence point per day for each of the four days she was absent.  Stipanovich testified that since the time of plaintiff's hire, the attendance policy has been made more stringent: it used to require ten points for disciplinary action (termination), but that number has been reduced to seven.

Thus, after accruing her seventh occurrence point under defendant's Attendance Control Policy on 08/12/2013, plaintiff was given a verbal warning on 09/25/2013 which could be taken into account in subsequent performance reviews.  It is worth noting that one of those seven points was set to expire on 10/23/2013, less than a month later, which under the policy would have made plaintiff ineligible for the verbal warning as of that date.

At some point after her second annual performance review on 07/24/2013, plaintiff was moved from straightening to the polymer room (also located in the set-up department) and placed under a new supervisor/foreman, Nicole/Nikki Kozak ("Kozak").  The parties are in dispute as to exactly when plaintiff was moved there, but plaintiff has produced evidence showing she started working there, at the latest, by mid-October 2013.[10]  Thus, in viewing the record in the light most favorable to plaintiff, the evidence shows that she had indeed started working in the polymer room under Kozak in or before mid-October of 2013.

---

[10]  Specifically, plaintiff produced an Incident Investigation Report dated 05/14/2014 wherein it is stated that she had been working under Kozak in the setup department as a polymer maker for "7 months" as of that date (i.e., since 10/14/2013).  (Doc. 55-1 at 18)  Defendant's contrary evidence – which comes from Kozak's deposition testimony and declaration and the declaration of defendant's Regional Human Resources Manager, Karen Hardt – is to the effect that plaintiff "probably" started working in the polymer room "right before" or "shortly" before Kozak conducted her midyear review on 03/27/2014.  (Doc. 50-1 at 31-32); (Doc. 50-1 at 44); (Doc. 50-2 at 11).

In contrast to her performance in straightening, plaintiff did well in the polymer room. Her new supervisor, Kozak, testified that plaintiff "showed progress through the whole training process." (Doc. 50-1 at 32). In her declaration, Kozak reiterated her perception of plaintiff's performance shortly after she had been moved to the polymer room to begin her new assignment there: "[A]s I indicated in my deposition, [plaintiff] had shown some promise in that assignment." (Doc. 50-2 at 11). Plaintiff stated in her own declaration that, after she was moved to the polymer room, "I not only met my production quotas but exceeded them." (Doc. 55-3 at 20).

These evaluations of plaintiff's performance were borne out by her subsequent "positive review." (Doc. 50-1 at 32). Due to plaintiff's previous substandard annual review score of 8 from her prior supervisor, she was given a *midyear* performance review by Kozak. On 03/27/2014, after working in this new assignment under Kozak for about five and a half months, plaintiff earned a performance review score of 13, which was one point above the score needed to "meet[] standard," i.e., indicating that plaintiff was "performing at or above the level required by his/her position." Kozak's comments in the review indicated: "Employee has improved productivity and quality. She has moved into a new position since last review and excelled in her new role." As a result of this "positive review," plaintiff received a midyear pay raise, which is something "underperformers" are not supposed to receive "[u]nless something has dramatically changed with [regard to] their performance." (Doc. 55-1 at 43).

Plaintiff attributed her improved productivity to "the assistance of medication and intermittent FMLA [leave]," which she sought to take on a periodic basis after she was again hospitalized for her leg condition on 02/26/2014. (Doc. 55-2 at 29-55); (Doc. 55-3 at 20) ("from time to time, my clotting condition would become painful, my legs would swell, and I would have to request FMLA [leave]"); (Doc. 50-3 at 36) (document reflecting plaintiff's

FMLA-related absences in April, May, June, July, August, and September of 2014). The Emergency Department ("ED") physician who treated plaintiff provided a signed doctor's note dated 02/26/2014 stating plaintiff "was seen in the ED on 2/26/14" and "is to be off work for 2 days." (Doc. 57-1 at 3).

Plaintiff subsequently was given another verbal warning for attendance on 03/18/2014. According to the attendance report, during the relevant twelve-month period under consideration (i.e., from 03/18/2013 to 03/18/2014), plaintiff was assessed half a point for each of two dates when she left work early (i.e., missing less than two hours of the scheduled work day on 08/12/2013 and 11/14/2013). Plaintiff was also assessed one point for each of six absences (or for missing more than two hours of the scheduled work day) on 05/11/2013, 07/25/2013, 01/03/2014, 02/28/2014, 03/05/2014, and 03/10/2014.

Several of these occurrence dates warrant particular scrutiny. First, as already noted, plaintiff's absence on 07/25/2013 occurred within the context of her calling off sick and producing a doctor's excuse two weeks after she returned to work from FMLA leave. Second, each of the points that accrued against plaintiff on 05/11/2013, 07/25/2013, and 08/12/2013 had also been used as the basis for her *prior* verbal warning for attendance on 09/25/2013, less than six months earlier. These overlappingly-used dates constituted more than one-third – 2.5 out of 7 – of the occurrence points which were cited as a basis for *both* verbal warnings. Similarly, when plaintiff subsequently was given yet another verbal warning for attendance on 07/29/2014, a little over four months later, it was based *almost entirely* on the same occurrences (i.e., constituting 6 out of the 7 points) for which she had already been cited on 03/18/2014. In other words, her 07/29/2014 warning for "accumulat[ing] 7 points" was due to a *single* new occurrence (on 07/22/2014). Moreover, the verbal warning on 07/29/2014 may have been given too late, since under the policy the one-point occurrence on 07/25/2013 would

have expired after 07/25/2014, which would mean that plaintiff did *not* have 7 points as of the date she was warned.

The parties are particularly in dispute about the attendance point that was assessed for plaintiff's absence on 02/28/2014. This point was used/re-used against her in *both* of her verbal warnings for attendance on 03/18/2014 *and* on 07/29/2014. As an initial matter concerning plaintiff's absence on that date, defendant asserts that the medical record is "ambiguous" in that the ED physician's note dated 02/26/2014 directing that plaintiff "is to be off work for 2 days" could mean she is to be off work either (1) on February 26 and 27 or (2) on February 27 and 28. In viewing the disputed record evidence in the light most favorable to plaintiff, therefore, the evidence shows that the ED physician intended plaintiff to be off work on 02/28/2014, the date on which defendant assessed her a point for being absent.

Not only was plaintiff's absence on that date excused by her physician, but it also was subsequently determined to be FMLA leave. On 04/22/2014, plaintiff was also approved, partially retroactively, to take 10 hours of FMLA leave per week from 02/26/2014 through 02/25/2015. (Doc. 50-3 at 33-34).[11] Defendant acknowledges:

> [O]nce approval of [plaintiff's] request for FMLA leave was granted on [04/22/2014], the February 26 and 27 absences were retroactively deemed to be approved FMLA leave. If one were to assume what is unclear from the record that her [02/28/2014] absence is also eligible for FMLA leave, a valid argument can be made that the attendance point issued for the [02/28/2014] absence should have been removed at that time and the verbal warning of [03/18/2014] revoked.

(Doc. 56 at 5-6). Defendant further acknowledges that the consequences of doing so could have affected the overall score plaintiff was given on her third (and what would turn out to be her last) annual performance review on 08/02/2014:

---

[11] Plaintiff's request for this FMLA leave was received by defendant's third-party FMLA administrator, Liberty Mutual Insurance, on 03/28/2014. (Doc. 55-3 at 15-17).

Had [plaintiff's verbal warning for attendance been revoked], an argument can also be made that Plaintiff's score for attendance in her [subsequent annual] performance evaluation of [08/02/2014] would have been a "2". Had that been done, her overall score [for that performance review] would have been a 10 instead of a 9.

(Doc. 56 at 6).

This score discrepancy relating to plaintiff's 08/02/2014 review is particularly significant in light of the fact that performance review scores became a major, if not decisive, factor under the termination policy which defendant first began implementing at around the same time.[12]   Under the new policy, any non-exempt hourly production employee who received two (2) consecutive sub-standard annual reviews (i.e., overall annual review scores of 11 or below) was to be terminated "immediately."  (Doc. 50-2 at 25.)

Sandra Matson ("Matson") – defendant's senior vice president of operations for the memorialization group, to which plaintiff's division belonged – testified that it was her decision to "initiate" the policy ("the Matson policy" or "Matson termination policy"), and she did so "to give [her] leadership team for operations some direction on how to deal with chronic underperformers."  (Doc. 50-2 at 20.)  Matson further testified that she initiated the policy in consultation with defendant's then Regional Human Resources Manager, Karen Hardt ("Hardt"). According to Hardt, the policy did *not* take midyear reviews into account, but only the two most recent annual reviews.  This meant that in plaintiff's case, her two best scores –

---

[12]  The record indicates that the new termination policy was being discussed among defendant's administrative personnel at least by early August of 2014 and that a formal articulation of the policy entitled "Guidelines for Underperformers" had been written and distributed via e-mail on 08/13/2014.  (Doc. 50-2 at 23.)  That e-mail, which referenced an earlier discussion and related email, indicated that "many of the reviews are completed or [still] underway and this [e-mail] might not be timely.  But, . . . I want to know about anyone [whose previous review was substandard] who has received or [is] about to receive the[ir] second substandard review."  (Id.)

Plaintiff's supervisor, Kozak, testified that she first learned of the new termination policy "sometime" in August of 2014 during a meeting with her manager (Bernie Kuhn) and the other supervisors.  (Doc. 50-1 at 32-33.)

11 on her first annual review and 13 on her recent midyear review – were not to be considered. This made plaintiff's final annual review score all the more significant.

In the comments section underneath the Attendance category of plaintiff's final annual review on 08/02/2014, it states "Verbal warning for attendance given on 7/29/14." (Doc. 50-2 at 5.) In the evaluator comments, it further states "[Plaintiff] needs to improve attendance." (Doc. 50-2 at 6.) As it relates to attendance, an employee is given a score of 1 "if [the] employee has received a verbal warning" and a score of 2 "if [the] employee has not received any warnings." (Id.) Plaintiff was given a score of 1. Defendant argues that even if her score had not been (improperly) lowered due to the verbal warning, "[p]laintiff would still have been subject to termination" pursuant to the Matson policy. But that argument assumes the attendance category score in plaintiff's 08/02/2014 performance review is the only one subject to dispute and/or correction.

As the record shows (and as defendant concedes), if plaintiff had received an attendance score of 2, then she only would have needed 2 more points to "meet[] standard." The only category in which plaintiff maxed out (i.e., achieved the maximum score) is Disciplinary. Thus, besides Attendance, there are five other categories in which plaintiff could have earned higher scores: Multi Skill; Productivity; Quality; Customer Service & Teamwork; and Safety Wellness. In three of those five categories – Multi Skill; Customer Service & Teamwork; and Safety Wellness – plaintiff had in fact scored a point higher on her previous review (i.e., on 03/27/2014). Notably, plaintiff's Productivity score in both her previous and final reviews was a 2, which "meets standard." (Doc. 50-2 at 5 & 12.)

Plaintiff specifically disputes the validity of several of her final review scores that were lower than her previous review. For instance, plaintiff's Multi Skill category score of 2 on her previous review (on 03/27/2014) indicated that she "can do 2 or 3 jobs," but her next and final

review (on 08/02/2014) gave her a 1 indicating that she "can only do one job."  Unlike all the other categories in which plaintiff's final review score was lower than her previous review, there was no comment specifically explaining the reason for this particular score reduction.

Plaintiff attributes these lower final review scores to the hostile attitude and treatment toward her use of FMLA leave that she faced leading up to her termination, which occurred a little over a month later on 09/09/2014.  Specifically, when plaintiff communicated her need for FMLA leave to her supervisor, Kozak gave her a very hard time and questioned her need for making such requests.  (Doc. 55-3 at 20.) ("[Kozak] would make comments such as 'do you have enough hours?'  Other times she would comment to me that I should not take intermittent FMLA because I was 'fine.'  Sometimes I would have to show her my swollen legs which was embarrassing and demeaning to me.  On other occasions, when I told [Kozak] that I had to leave early for intermittent FMLA because my legs were causing me pain and were swelling, she would make comments such as 'what do you mean you are leaving'?  She made it clear to me that she did not appreciate my use of FMLA and found [it] to be burdensome.").  This treatment from Kozak escalated after plaintiff advised Kozak about her upcoming need to have surgery, for which plaintiff was placed on a waitlist for several months.  (Doc. 55-3 at 20-21.) ("After telling [Kozak] about my upcoming need for surgery, I was subjected to harsher treatment by [Kozak].")

Specific instances of such treatment were reflected in Kozak's comments noted in plaintiff's final performance review.  In the Customer Service & Teamwork category, in which plaintiff's final review score was lower than her previous one, it states: "Discussion on 6/2[/2014] about cell phone use during work hours and being away from workstation."  On this occasion, plaintiff was using her cell phone to return a call from her doctor's office relating to her upcoming surgery.  She took the call away from her work area, which was a common

14

practice among her coworkers and one that she believed to be permitted, as plaintiff had previously observed her coworkers on countless occasions using their phones in front of Kozak without being written up.  In fact, when asked in her deposition how many employees she had "written up" for cell phone use, Kozak stated "none."  (50-1 at 37.)  Kozak further testified that she had only "conferenced" a "couple" of employees for that particular infraction.  (50-1 at 38.)[13]  While she was unable to recall the names of any employees other than plaintiff that she had conferenced for cell phone use, Kozak "assum[ed]" that these other employees were still employed by defendant.  (Id.)  These remarks made during Kozak's testimony relating to conferencing and writing up employees for cell phone use occurred in the context of discussing defendant's "disciplinary" actions and procedures.  Yet, as previously mentioned, plaintiff was given the *maximum* score (i.e., 2) in the Disciplinary category, which is given "if [the] employee has not received any warnings [within the last 12 months other than those related to attendance]."  Thus, plaintiff's warning for "cell phone use" on 06/02/2014, which was cited as a basis (or *the* basis) for lowering her Customer Service & Teamwork score, simply does not square with other evidence in the record.[14]

In the Safety Wellness category, in which plaintiff's final review score was lower than her previous one, it states: "Has been coached multiple times about [wearing] PPE [personal protective equipment].  Last discussion on 6/17[/2014]."  To the contrary, however, plaintiff was diligent about her safety and was a particularly "safety oriented" employee who was especially conscious of her personal safety in light of her medical condition.  (Doc.  55-3 at 21-

---

[13]  There does not appear to be any evidence in the record of cell phone use violations by any other employees during the actual time frame of plaintiff's employment: April of 2012 to September of 2014.  Rather, the only evidence of such violations occurred in or after April of 2015, more than seven months after plaintiff was terminated.  (Doc. 55-2 at 16-20).
[14]  The 06/02/2014 conference form itself warned plaintiff that "if cell phone is in use during work hours further disciplinary action will be taken."  (Doc. 50-3 at 49).

22.)  It is noteworthy that the score of 0 that plaintiff was given in this category indicated that she "needs improvement [in this area, which is defined as] being notified of a safety infraction or violation of policy," and yet, unlike all the other warnings plaintiff was given, no independent evidence of this infraction/violation appears anywhere in the record.  Even though it is explicitly stated on her review that plaintiff was coached "multiple times" about this, no document – e.g., notice of disciplinary action or employee conference form – appears in the record of any specific instance, which differs from every *other* such instance of disciplinary and non-disciplinary (training and coaching) action cited against plaintiff dating all the way back to May of 2012.

In addition, there also is evidence of what was taking place behind the scenes during plaintiff's final performance review, namely: the implementation of the Matson termination policy.  E-mail correspondence in the record indicates the following occurred.

First, a number of performance review scores were being or had been changed to spare certain employees from termination.  On 08/09/2014, defendant's plant manager Greg Geers ("Geers") stated: "There are a couple of employees [for whom] we will be making some adjustments."  (Doc. 55-2 at 9.)  On 08/11/2014, in an email to Geers in reference to "2014 Evaluation Grades with 2013 data," Hardt stated: "Based on your e-mail, I changed Johnson and Heath." (Doc. 55-2 at 5.)  On 08/15/2014, Geers stated that he "had our guys do a calibration on Scott Lorenze and his score has gone from an 11 to a 12 (he was given another point for being multi skilled)." (Doc. 55-1 at 74.)  On 08/22/2014, Hardt pointed out that "Jim Sadler [had scored] a 10 for 2 consecutive years" and questioned why he was not among the employees being considered for termination.  Geers replied "there was a mistake on his initial review, he is now a 12."  And Geers acknowledged that he had made the change to the employee's initial review score himself.  (Doc. 55-1 at 70.)

16

Second, defendant generally was aware of the potential liability for terminating some of the employees it had "slated for termination."  (Doc. 50-1 at 43).  It also was aware of some specific concerns with respect to terminating plaintiff due to her FMLA status.  On 08/11/2014 at 12:46 PM, Hardt stated: "I need to review some of the PIP* [performance improvement plan] immediate termination information to ensure we have appropriate documentation on file."  (Doc. 55-1 at 29.)  On 08/11/2014 at 1:14 PM, Geers identified plaintiff and six other employees as being among "[t]he 2 year in a row employees that do not meet standard" (Doc. 55-2 at 7.)  Hardt replied at 1:50 PM with some concerns about terminating these employees "immediately" and specifically highlighted the need to have a performance improvement plan "on file [to] serve as justification" for the termination decision.  (Id.)  Hardt expressed particular concern with regard to terminating plaintiff, as she had "similar [performance review scores]" to other employees that were not subject to termination.  Hardt also implied that plaintiff was not among "[t]he others on [Geer's list who were] definitely consecutive 'does not meet' performers."  (Id.)  In an email discussing plaintiff's midyear review, Hardt stated at 2:46 PM: "Not suggesting that her performance hasn't changed since that time but you understand why we maybe [sic] challenged."  (Doc. 55-2 at 4.)

The record reflects that there was some uncertainty regarding the immediate termination of plaintiff.  On 08/13/2014 at 12:55 PM, Geers asked Hardt: "Have you decided what you would like to do with [plaintiff]?" (Doc. 55-2 at 5.)  At 12:59 PM, Hardt stated: "Based on the comments in the mid-year review I am finding it challenging to immediately term[inate] her.  I . . . will review past performance reviews and make a determination and let you know tomorrow."  (Doc. 55-2 at 4.)  At 1:04 PM, Geers replied: "Im [sic] fine either way, just want your recommendation.  She is not a 'cancer' so I will abide by your recommendation without any resistance."  (Id.)

On 08/14/2014 at 10:01 AM, in an email to Hardt, Stipanovich referenced Geers' list of employees (including plaintiff and six others) identified as "[t]he 2 year in a row employees that do not meet standard" and specifically indicated two of those employees had been approved to take FMLA leave – plaintiff and Scott Lorenze ("Lorenze"). Stipanovich then went into detail describing plaintiff's personal situation and attendance record thus:

> [Plaintiff] has FMLA that covers 10 hours of absences per week due to pain in her knee. [Plaintiff] also has a boyfriend with a long term illness that she also takes off for. She appears to be honest about when she is calling off as to whether it is for herself and she uses FMLA or if she is calling off for other reasons. She did inquire about FMLA to care for her boyfriend. I explained to her if they married she would be eligible for the additional FMLA. The reason that they won't marry is that he would lose his state paid for benefits. [Plaintiff] is currently at 6 attendance points. She received a verbal warning on [07/29/2014]. Additional verbal warnings were received on 9/25/13 and 3/18/2014.

(Doc. 55-1 at 58.) Stipanovich had a lot less to say about employee Lorenze's situation. She noted his reason for taking FMLA leave and when it had been approved. Beyond this basic information Stipanovich stated she did not even know "how many hours or days that he is covered for per week or per month." (Id.)

On that same day (08/14/2014), Hardt stated in an email to Geers:

> Both [plaintiff] and [Lorenze] have been approved for intermittent FMLA. There is some risk with terminating these employees and although we recognize that neither has been a consistently Meets Expectation Performer, the FMLA adds another component. I have reviewed the case information [and] believe the performance issues began well before the FMLA request and therefore we can move to terminate. We must be consistent in our treatment of both employees. I provided [plaintiff's] prior performance [scores] and I am also providing [Lorenze's] (2012 = 12; 2013 = 10; 2014 midyear = 12; 2014 = 11). I also attached [Lorenze's] year-end 2013 performance review as well as his midyear in the event you wanted to compare it with the 2014 review. As agreed, we should make Sandra aware of the added risk component with these 2 individuals. Call me if you want to discuss further.

18

(Doc. 55-1 at 74.)  Despite Hardt's suggestion to Geers that "[w]e must be consistent in our treatment of both [plaintiff and Lorenze]," Geers stated in an email to Hardt on 08/15/2014: "I had our guys do a calibration on [Lorenze] and his score has gone from an 11 to a 12 (he was given another point for being multi skilled).  I hope this doesn't create any new issues."  (Doc. 55-1 at 72).

There continued to be uncertainty regarding the decision to terminate plaintiff.  In an email to Geers and Stipanovich on 08/20/2014, Hardt asked: "Do we have a final list [of employees subject to termination pursuant to the Matson policy] for tomorrow's meeting with [Matson]?  I know there were some changes.  Please send the updated information."  (Doc. 55-1 at 72.)  At 10:05 AM, Geers replied to Hardt and Stipanovich with the final version of the list which, notably, did not include Lorenze.[15]  On the list, next to plaintiff's name, it said parenthetically: "(if we are in agreement)."  (Id.)  Thus, the "final list" was anything but.

Defendant's indecision regarding plaintiff's termination was seemingly resolved after an upper-level employee named Jim Cessna expressed particular distaste for plaintiff's absences from work "during [defendant's] busy season."  In a 09/04/2014 email to Geers, Cessna expressed "concern[] about the recent rash of employee complaints received at the Corporate Level."  Cessna further stated: "[a]s I look through your incident trends, I have seen an increase [in] those head scratching type of claims [from certain specifically named employees including plaintiff] . . . during our busy season."  In addition to referencing plaintiff by name, Cessna also specifically noted that plaintiff had made 3 out of the 6 "head scratching" claims.  (Doc. 55-1 at 68.)

In a somewhat obscure reply to Cessna on the same date (09/04/2014), Geers expressed that

---

[15]  To be clear, Lorenze was *not* terminated pursuant to the Matson policy.

> [W]e need support from up above.  We have many competing
> priorities and limited resources.  I am sure you understand what I
> mean, if not we can discuss via the phone . . . We can certainly do
> another [employee] survey, but we need to think how to get honest
> answers from the employees and not answers with agendas.  If we
> are being evaluated on the merit of [the employees who recently
> made a "rash" of complaints received at the corporate level], then
> we are truly doomed.  In addition, if we really believe that [the
> specifically named employees including plaintiff who made "head
> scratching" claims] are nothing more than employees trying to
> "cheat" the system then we have already failed.

(Id.)

Plaintiff's termination followed in short order (i.e., five days later).  Plaintiff testified that her supervisor Kozak was aware that plaintiff was waiting for a call from her doctor about the date she was supposed to have her upcoming leg surgery.  Plaintiff's doctor called her on 09/07/2014 and she then learned for the first time that she would be able to have her surgery on 09/10/2014.  Plaintiff went to Kozak "as soon as [she] got the call" from her doctor.  Kozak marked down on the calendar that plaintiff needed to be off on the surgery date (09/10/2014) and on the following day (09/11/2014) to rest after the surgery.  Because plaintiff was aware that this was during defendant's "busy season," she further advised Kozak that she would additionally need to be off on 09/20/2014 for a follow-up doctor's appointment related to her leg surgery.  Plaintiff asked her supervisor if there was anything further she needed to do in order to request leave, such as obtaining paperwork from Stipanovich in HR or proof from her doctor.  Kozak said nothing further was needed beyond being advised of the specific dates plaintiff was requesting to have off, which she and Kozak agreed were going to be designated as FMLA leave.

On 09/09/2014, at the end of her shift, plaintiff and five other employees were terminated pursuant to the Matson policy.  Among those employees, plaintiff and one other employee (Louis Parrott) had received FMLA leave.  Subsequently, on 08/14/2015, defendant

terminated two additional employees pursuant to the Matson policy (Tara Elliott and George Peharpre), both of whom had received FMLA leave.  Thus, four out of the eight total employees terminated as "underperformers" (between 04/01/2012 and 12/31/2016) were recipients of FMLA leave.  (Doc. 55-3 at 5-13.); (Doc. 50-2 at 31-37).

Plaintiff had her surgery on 09/10/2014 as scheduled.

As further background to defendant's termination decision, plaintiff produced evidence that defendant had been engaged in an ongoing workforce reduction and productivity/efficiency improvement process known as "leaning."  See, e.g., (Doc. 55-1 at 60-64) (showing that as part of the "calibration process for the hourly, non-exempt employees," the target or "guideline" number receiving the "Does Not Meet Standard" score range was set at 5%).  This process began in 2011 and was ongoing as of plaintiff's termination.  As Kozak testified, the goal of defendant's "lean principles" was "to produce the most with the least amount of people."  (Doc. 55-3 at 26.)  Plaintiff produced evidence reflecting a substantial reduction in defendant's workforce occurring during the time period relevant to this case. Defendant's December 2012 production employee headcount was over 300 employees. (Doc. 55-1 at 56)  By August of 2017 it had been reduced to "close to 150" employees.  (Doc. 55-3 at 43)

Plaintiff also produced evidence of the burden and strain her use of FMLA leave had on defendant's operations.  These repercussions were particularly difficult for Kozak – who, as a foreman, was evaluated based on the productivity of the workers she supervised/oversaw. (Doc. 55-3 at 32-33.)  Whenever plaintiff would take FMLA leave, Kozak would have to pull another employee from the shop floor who was trained to work in the polymer room – which would take that employee away from doing some other kind of production activity.  See, e.g., (Id.)  Kozak testified: "If we have someone that can run [the polymer room], we would put

someone in there.  If we don't, no one would run it." (Doc. 55-3 at 30-31.)  Kozak could not recall how often she was able to get another employee to run the polymer room.  She could only recall two employees who either worked or were trained to work in the polymer room (Shawn Thornblom and Jerry Pool).  (Doc. 55-3 at 31.)

Against this backdrop, defendant's contention that the record contains insufficient evidence to support plaintiff's interference claim is unavailing.  In 1993, Congress passed the FMLA to help employees "balance the demands of the workplace with the needs of families" and allow them to "take reasonable leave for medical reasons."  29 U.S.C. § 2601(b)(1) and (2).  Under the FMLA, an eligible employee is "entitled to 12 workweeks of leave during any 12–month period due to an employee's own serious health condition."  Ross v. Gihuly, 755 F.3d 185, 191 (3d Cir. 2014) (citing 29 U.S.C. § 2612(a)(1)).  Once the twelve week leave period has expired, the employee then has the "right to be restored to his or her original position or its equivalent."  Lupyan v. Corinthian Colleges, Inc., 761 F.3d 314, 318 (3d Cir. 2014) (citing Id. § 2614(a)(1)).

An employer may face liability under the FMLA (1) "if it *interferes* with a right that the Act guarantees" or (2) "if it *retaliates* against an employee for invoking the Act's protections." Budhun v. Reading Hosp. and Medical Center, 765 F.3d 245 (3d Cir. 2014) (citing 29 U.S.C. § 2615 and 29 C.F.R. § 825.220) (emphasis added).  These are known as the FMLA's interference and retaliation provisions, § 2615(a)(1) and § 2615(a)(2) of Title 29, respectively.  Plaintiff has advanced claims under each of these provisions.

The interference provision states: "It shall be unlawful for an employer to interfere with, restrain, or deny the exercise of or the attempt to exercise [FMLA rights]."  29 U.S.C. § 2615(a)(1).  Violations of FMLA regulations prohibiting interference likewise are actionable. See generally 29 C.F.R. § 825.220(b).  One such regulation provides that "employers cannot use

the taking of FMLA leave as a negative factor in employment actions, such as . . . disciplinary actions; nor can FMLA leave be counted under no fault attendance policies."  29 C.F.R. § 825.220(c).  The Third Circuit has interpreted this language – "the *taking* of FMLA leave" – broadly to connote the "*invocation* of FMLA rights, not [necessarily the] actual commencement of leave."  Erdman v. Nationwide Ins. Co., 582 F.3d 500, 509 (3d Cir. 2009) (emphasis added).  Thus, after observing that "it would be patently absurd if an employer who wished to punish an employee for taking FMLA leave could avoid liability simply by firing the employee before the leave begins," the court expressly held that "firing an employee for a valid request for FMLA leave may constitute interference with the employee's FMLA rights as well as retaliation against the employee."  Erdman, 582 F.3d at 508-509.

To succeed on an interference claim, a plaintiff must show: (1) he or she was an eligible employee under the FMLA; (2) the defendant was an employer subject to the FMLA's requirements; (3) the plaintiff was entitled to FMLA leave; (4) the plaintiff gave notice of his or her intention to take FMLA leave; and (5) the plaintiff was denied benefits to which he or she was entitled under the FMLA.  Ross v. Gilhuly, 755 F.3d 185, 191-92 (3d Cir. 2014) (citing Johnson v. Cmty. Coll. Of Allegheny Cnty., 566 F. Supp.2d 405, 446 (W.D. Pa. 2008)).  Under the regulations promulgated by the Department of Labor, interfering with the exercise of an employee's FMLA rights includes not only *refusing* to authorize FMLA leave, but also *discouraging* an employee from using such leave.  See 29 C.F.R. § 825.220(b).  Stated more succinctly, the essential showing that the employee-plaintiff has to make is twofold: that (1) she was entitled to FMLA benefits and (2) her employer denied (or otherwise interfered with) them.  See Callison v. City of Philadelphia, 430 F.3d 117, 119 (3d Cir. 2005); see also Foye v. SEPTA, 2017 WL 1150259 (E.D. Pa. March 28, 2017).

Here, defendant has expressly conceded that plaintiff has shown all but the last of these requirements – i.e., that defendant denied plaintiff FMLA benefits to which she was entitled. (Defendant's Brief in Support of Motion for Summary Judgment, Doc. 51 at 9).  Thus, as the record demonstrates, plaintiff was an eligible employee under the FMLA, defendant was an employer subject to the FMLA's requirements, and plaintiff was entitled to FMLA leave and gave notice to the defendant of her intention to take such leave.

While defendant focuses its argument solely on the issue of whether plaintiff was denied FMLA benefits to which she was entitled "when she requested leave for surgery on [09/07/2014]" (and subsequently was terminated prior to the start of that leave request), that was but *one* of the instances of potential FMLA interference reflected in the record.  As plaintiff points out in her brief, there is also evidence that defendant used plaintiff's retroactively-approved FMLA absence(s) on or about 02/28/2014 as a basis for taking disciplinary action against her on two separate occasions and ultimately as a basis for terminating her.  (Plaintiff's Brief in Opposition to Motion for Summary Judgment, Doc. 54 at 5-6).

Enough evidence has been adduced to permit a jury to decide plaintiff's claim for FMLA interference, both as to defendant's disciplinary actions and its termination of her employment – which, it is worth noting, are not unrelated.  Although the FMLA prohibits employers from using "the taking of FMLA leave as a negative factor in employment actions, such as . . . disciplinary actions" and from counting FMLA leave under no fault attendance policies, the record supports the view that that might well have been the case here as it relates to plaintiff's doctor-excused and retroactively-designated FMLA leave taken between 02/26/2014 and 02/28/2014.  29 C.F.R. § 825.220(c).  Not only was plaintiff's absence on 02/28/2014 used as a basis for *both* of the subsequent verbal warnings she was given for attendance on 03/18/2014 and 07/29/2014, but the latter verbal warning was *also* used as a basis for subsequently reducing her attendance score in

her final performance review on 08/02/2014, which was itself subsequently used as part of the basis for terminating her employment on 09/09/2014.  The fact that plaintiff was terminated prior to her scheduled FMLA leave (which began on 09/10/2014) is immaterial to her interference claim, as our Court of Appeals determined in Erdman, since the interference is with her invocation of FMLA rights rather than her actual use of FMLA leave.  While defendant argues that it did not interfere with plaintiff's request for FMLA leave in this instance because it "satisfied its responsibility to designate the leave as FMLA-qualifying" and did not "deny[]" the request, the mere fact that Kozak "made a note on the office calendar" indicating that plaintiff's request for leave had been granted and designated as FMLA did nothing to change the injury she suffered in being terminated just two days later and one day before her leave was to begin. (Doc. 51 at 10).

Defendant also argues that it did not interfere with plaintiff inasmuch as it allowed her to take, and that she did take, many hours of intermittent FMLA leave prior to her termination. (Id.) ("Plaintiff was informed, aware of and exercised her rights freely under [defendant's] FMLA intermittent leave approval.").  This contention also is unavailing, however, because interference with the exercise of an employee's FMLA rights includes not only refusing to authorize FMLA leave, but also *discouraging* an employee from using such leave.  29 C.F.R. § 825.220(b).  And there is record evidence that plaintiff was discouraged by her foreman/supervisor, Kozak, from using intermittent FMLA leave.  Kozak gave her a hard time for requesting it and she selectively enforced disciplinary actions against plaintiff that were seemingly FMLA-related (e.g., for attendance and cell phone use).  Thus, enough evidence has been adduced to permit a jury to decide plaintiff's claim for interference.

Moreover, a claim of interference differs from one of retaliation in that the former is not about discrimination or discriminatory intent, but instead is about "'whether the employer

provided the employee with the entitlements guaranteed by the FMLA.'" Capps v. Mondelez
Global, LLC, 847 F.3d 144, 155 (3d Cir. 2017) (quoting Callison v. City of Phila., 430 F.3d 117,
120 (3d Cir. 2005)).  Accordingly, under an interference theory "the employee need not show
that [s]he was treated differently than others[, and] the employer cannot justify its actions by
establishing a legitimate business purpose for its decision." Sommer v. The Vanguard Group,
461 F.3d 397, 399 (3d Cir. 2006) (quoting Callison, 430 F.3d at 119-20.).  Therefore,
defendant's assertion that "[p]laintiff has failed to proffer evidence that Kozak had authority to
or was in any way involved in enforcing [defendant's] performance review policy which led to
her termination" is not determinative of her interference claim; it is, however, relevant to the
analysis of her retaliation claim.

Enough evidence likewise has been adduced to permit a jury to decide plaintiff's claim
for retaliation.  The retaliation provision of the FMLA states: "It shall be unlawful for any
employer to discharge or in any other manner discriminate against any individual for [invoking
FMLA rights]." 29 C.F.R. § 2615(a)(2).  Claims of retaliation under the FMLA are analyzed
under the McDonnell Douglas burden-shifting framework.  See Budhun v. Reading Hosp. &
Med. Ctr., 765 F.3d 245, 256 (3d Cir. 2014) (applying McDonnell Douglas framework to FMLA
retaliation claims).  Under this framework, the  analysis proceeds in three stages: (1) the plaintiff
must establish a *prima facie* case of retaliation; (2) if the plaintiff establishes a *prima facie* case,
the defendant must articulate a legitimate, nondiscriminatory reason for its adverse action against
the plaintiff; (3) and, if the defendant does so, the burden then returns to the plaintiff to prove by
a preponderance of the evidence that the defendant's proffered reason is a pretext for retaliation.
McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-803 (1973); Williams v. Phila. Hous.
Auth. Police Dep't., 380 F.3d at 759 n.3.  While the burden of production may shift, the burden
of persuasion remains at all times with the plaintiff.  Id.

26

To state a *prima facie* claim of retaliation under the FMLA, plaintiff must show that (1) she invoked her right to FMLA-qualifying leave, (2) she suffered an adverse employment action, and (3) that adverse action causally was related to the invocation of her FMLA rights. Lichtenstein v. Univ. of Pittsburgh Med. Ctr., 691 F.3d 294, 301-02 (3d Cir. 2012) (citing Erdman).  In the instant context, defendant concedes for purposes of summary judgment that plaintiff met her initial burden of stating a *prima facie* case – particularly the first two elements, which were easily satisfied by her FMLA leave request and subsequent termination, respectively. Moving beyond the *prima facie* case, defendant maintains that plaintiff cannot carry her burden on the third element, i.e., causation.  (Defendant's Brief in Support of Motion for Summary Judgment, Doc. 51 at 14).

Having thus established a *prima facie* case of retaliation, the burden shifts to defendant to proffer a legitimate, non-discriminatory reason for taking the adverse employment action. Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 644 n.5 (3d Cir. 1998); Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1108 (3d Cir. 1997).  This burden is "relatively light" and is satisfied if the employer provides evidence "which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." Tomasso v. Boeing Co., 445 F.3d 702, 706 (3d Cir. 2006) (quoting Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994)); see also Lichtenstein v. Univ. of Pittsburgh Med. Ctr., 691 F.3d 294, 302 (3d Cir. 2012) (describing this step as a "minimal burden").

Here, defendant has met the minimal burden of offering a legitimate, non-discriminatory reason for plaintiff's termination.  Defendant maintains that plaintiff was terminated pursuant to the policy it adopted in or around August 2014 (i.e., the Matson policy).  According to that policy, any non-exempt hourly production employee who received two consecutive sub-standard annual review scores (i.e., 11 or below) was to be terminated.  Plaintiff cannot deny that in her

last two annual reviews she received a score of 8 on 07/24/2013 and 9 on 08/02/2014, both of which were below standard.  This is enough to shift the burden back to plaintiff.

The burden thus having returned to plaintiff, she must come forward with evidence showing that defendant's proffered explanation was a mere pretext for retaliation.  She may do so by introducing evidence demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder *could* rationally find them unworthy of credence, and hence infer that the employer did not act for the asserted non-discriminatory reasons." Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994) (citations omitted).  In meeting this burden the plaintiff need not cast doubt on every explanation advanced by the defendant, but rather is only required to present sufficient evidence from which a factfinder reasonably could infer that each of the employer's proffered non-discriminatory reasons is unworthy of credence.  Id. at 764.  For example, "[i]f the defendant proffers a bagful of legitimate reasons, and the plaintiff manages to cast substantial doubt on a fair number of them, the plaintiff may not need to discredit the remainder." Id. at 764 n. 7.  "That is because the factfinder's rejection of some of the defendant's proffered reasons may impede the employer's credibility seriously enough so that a factfinder may rationally disbelieve the remaining proffered reasons, even if no evidence undermining those remaining rationales in particular is available." Id.

Plaintiff also can meet her burden at the third stage of the McDonnell Douglas analysis by identifying evidence which would permit the finder of fact to infer that invidious discrimination was more likely than not a motivating or determinative cause of the adverse employment action.  "For example, the plaintiff may show that the employer has previously discriminated against [the plaintiff], that the employer has previously discriminated against other persons within the plaintiff's protected class, or that the employer has treated more favorably

similarly situated persons not within the protected class." <u>Simpson</u>, 142 F.3d at 645.  In making this demonstration, a plaintiff "cannot selectively choose a comparator" amid a sea of employees who are otherwise treated equally with the plaintiff, but instead must point to evidence that is probative of unequal treatment motivated by discriminatory animus.  <u>Id.</u> at 645-647.

Plaintiff has presented sufficient evidence of pretext to permit a jury to decide her claim for retaliation under the FMLA.  Particularly salient is the "temporal proximity" between plaintiff's request for FMLA leave and her termination only two days later.  <u>See</u> <u>Woodson v. Scott Paper Co.</u>, 109 F.3d 913 (3d Cir. 1997) ("Our cases have established that temporal proximity between the protected activity and the termination is sufficient to establish a causal link.") (citing <u>Jalil v. Avdel Corp.</u>, 873 F.2d 701, 708 (3d Cir. 1989) ("[Plaintiff] demonstrated the causal link between the two by the circumstance that the discharge followed rapidly, only two days later, upon [defendant's] receipt of notice of [plaintiff's] EEOC claim.")).  Other Third Circuit cases likewise have found such temporal proximity to be significant.  <u>See</u> <u>Moore v. City of Philadelphia</u>, 461 F.3d 331, 351-52 (3d Cir. 2006) (finding where "only a short period of time separates an aggrieved employee's protected conduct and an adverse employment decision" that "'temporal proximity may provide an evidentiary basis from which an inference of retaliation can be drawn' by the factfinder") (quoting and following <u>Fasold v. Justice</u>, 409 F.3d 178, 190 (3d Cir. 2005)).

Defendant correctly points out that evidence of timing ("temporal proximity") might be, but is not always, sufficient, and that another factor may be critical in establishing or defeating the causal link: evidence of ongoing antagonism.  <u>See</u> <u>Abramson v. William Paterson College of New Jersey</u>, 260 F.3d 265, 288 (3d Cir. 2001) (observing that evidence of "timing" and "ongoing antagonism" are the "two main factors" on which our circuit's case law has focused in finding

the causal link required for retaliation).  See also Jensen v. Potter, 435 F.3d 444, 450 (3d Cir. 2006) ("Timing alone raises the requisite inference when it is 'unusually suggestive of retaliatory motive,' but even if 'temporal proximity . . . is missing, courts may look to the intervening period for other evidence of retaliatory animus.") (internally quoting Krouse v. American Sterilizer Co., 126 F.3d 494, 503-04 (3d Cir. 1997)), *overruled in part on other grounds by* Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006).

But contrary to defendant's construction of the record, the evidence pertaining to the events leading up to plaintiff's termination is sufficiently suggestive of an ongoing level of antagonism towards plaintiff – particularly during the time period between her penultimate (midyear) and final (annual) reviews.  In her midyear review – which her supervisor considered to be a "positive review" but conspicuously was not counted in her favor – she earned a  score of 13, which was above the score needed to "meet[] standard," i.e., indicating that the "[e]mployee is performing at or above the level required by his/her position."  Based on that review she was given a pay raise demonstrating that her performance had improved "dramatically."  In the review plaintiff had "not only met [her] production quotas but exceeded them," which was reflected in Kozak's comments to the effect that plaintiff had "improved [her] productivity and quality" and was "excel[ing]" in her new position.   In a little over four months, however, plaintiff went from "excel[ing]" to being considered among the defendant's "chronic underperformers" subject to "immediate termination" pursuant to the Matson policy.

In the time between plaintiff's midyear and final reviews (i.e., late March 2014 through early August 2014), plaintiff began taking FMLA leave on an intermittent basis shortly after she was hospitalized (again) for her leg condition on 02/26/2014.  And she continued to request such leave in spite of the hostile attitude and treatment she received from Kozak, who gave her a hard time and questioned her need for making such requests.

During this time period, plaintiff received multiple verbal warnings for attendance from Kozak, for which she was assessed points under defendant's Attendance Control Policy.  Many of these points were based on the exact same occurrences, at least one of which – plaintiff's absence on 02/28/2014 – was determined to be FMLA leave (as defendant concedes). Nevertheless, that same absence was counted against plaintiff and formed part of the basis for her verbal warnings on two separate occasions (on 03/18/2014 and 07/29/2014).  The latter verbal warning was further used as part of the basis for lowering plaintiff's final review score (as defendant again concedes).

In the other categories besides Attendance, plaintiff's scores also were lowered in seemingly suspect ways.  In her Multi Skill score it was determined, without explanation, that she was unable (or no longer able) to perform more than one job, despite being rated as able to do so as of the time of her last review.  Her Customer Service & Teamwork score was lowered based on a 06/02/2014 cell phone use infraction, for which plaintiff produced evidence that she was singled out.  Similarly, plaintiff's Safety Wellness score was reduced to zero due to her allegedly having been coached "multiple times" (the most recent time being 06/17/2014) about wearing personal protective equipment, but unlike all the other alleged infractions, no documentation of any such infraction or specific instance of coaching appears in the record. What does arise is the inference that plaintiff's final review score – which played a fairly decisive role in defendant's "underperformer" termination policy – was based upon, at best, vague criteria like "[d]emonstrate[d] adherence to workplace expectations."  A jury may well conclude that defendant's agents used these broad, generalized concepts to produce an artificially low review score and thereby subject her to termination. (Doc. 50-2 at 6).

Further evidence of ongoing antagonism towards plaintiff – which, at a minimum, casts doubt on defendant's proffered reasons for terminating her – appears in the e-mails exchanged by

defendant's agents while carrying out the Matson policy.  The e-mails show that defendant's agents "adjust[ed]" several *other* employees' review scores to spare them from immediate termination under the policy.  At one point, defendant's Regional HR Manager (Hardt) expressed particular concern regarding the termination of plaintiff because she had "similar" performance review scores to other employees that evidently were being exempted from termination.  Hardt highlighted the particular "added risk" associated with terminating employees who had taken FMLA leave, and despite her insistence that "[w]e must be consistent in our treatment" of plaintiff and these other employees, the other employees' scores subsequently were "calibrat[ed]," thus sparing them from termination.  Apparently Hardt's advice sunk in for a time, as the record indicates defendant's agents were temporarily undecided as to plaintiff's ultimate fate under the policy.  That brief period of indecision was resolved, however, shortly after an upper-level corporate employee (Cessna) expressed disapproval of plaintiff's use of FMLA leave.  He identified her by name as one of several employees who recently made a "rash" of complaints, including multiple "head scratching type of claims . . . during [defendant's] busy season."  In reply to Cessna, defendant's plant manager (Geers) stated that the specifically named employees, including plaintiff, who made "head scratching" claims may be "nothing more than employees trying to 'cheat' the system."[16]  Three days later plaintiff requested FMLA leave for her upcoming surgery date.  Two days after that, she was terminated.

Thus, sufficient evidence to support the necessary causal link for plaintiff's retaliation claim is presented both in terms of timing (temporal proximity) and of ongoing antagonism towards plaintiff.  Plaintiff's use of FMLA leave at the most difficult time for defendant and the duration and ongoing nature of that leave were necessarily underlying the discussions about

---

[16]  Of course, a jury may well infer that defendant perceived plaintiff's efforts at "cheating the system" as the embellished use of FMLA leave when she was most needed.

whether plaintiff needed to be treated in a consistent manner with other similarly situated employees being evaluated under the Matson Policy. A number of these other employees received re-calibrated scores. Plaintiff did not, despite receiving a very favorable midyear review. The factfinder may well infer that the frequency and ongoing nature of plaintiff's need for FMLA leave accounted for this difference. Consequently, plaintiff has presented sufficient evidence of pretext to have a jury to decide her claim for retaliation under the FMLA.

Finally, the record undisputedly demonstrates that throughout her employment with defendant, plaintiff did not have an express written contract of employment. And because it is well-settled under Pennsylvania law that there is no implied contract of employment, plaintiff therefore was at all relevant times an employee at-will. As a result, her employment was subject to termination at either her or her employer's will. Furthermore, because a statutory remedy is available to plaintiff – indeed, she is presently seeking to avail herself of one – her cause of action for wrongful discharge fails as a matter of law. It follows that there are no material facts in dispute regarding plaintiff's claims for breach of contract and wrongful discharge, and defendant's motion for summary judgment as to these claims will be granted.

Date: July 31, 2020

                                        s/David Stewart Cercone
                                        David Stewart Cercone
                                        Senior United States District Judge


cc:    David M. Kobylinski, Esquire
       Peter T. Kobylinski, Esquire
       Thomas H. May, Esquire

          (*Via CM/ECF Electronic Mail*)

33